UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KRISTEN ROGERS, | ) |
|         Plaintiff, | ) Case No. _____ |
| v. | ) JURY TRIAL DEMANDED |
| CELGENE CORPORATION, MARK J. ALLES, RICHARD W. BARKER, HANS BISHOP, MICHAEL W. BONNEY, MICHAEL D. CASEY, CARRIE S. COX, MICHAEL A. FRIEDMAN, JULIA A. HALLER, PATRICIA HEMINGWAY HALL, JAMES J. LOUGHLIN, ERNEST MARIO, and JOHN H. WEILAND, | ) |
|         Defendants. | ) |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by her undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This is an action brought by Plaintiff against Celgene Corporation ("Celgene" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Celgene, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with Bristol-Myers Squibb Company's ("Bristol-Myers") proposed acquisition of Celgene (the "Proposed Transaction").

2. On January 2, 2019, Celgene entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Bristol-Myers will acquire Celgene in a cash and stock

1

transaction valued at $74 billion, with Celgene shareholders getting one share of Bristol-Myers common stock, one contingent value right, and $50 in cash for each Celgene share (the "Merger Consideration").

3. If the Proposed Transaction is completed, Bristol-Myers shareholders will own 69 percent of the combined entity and Celgene shareholders will own the rest,

4. On February 1, 2019, in order to convince Celgene's public common shareholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading joint proxy statement/prospectus on a Form S-4 Registration Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) certain line items and components underlying the financial projections for Celgene; (ii) the valuation analyses performed by Celgene's financial advisors, J.P. Morgan Securities LLC ("J.P. Morgan") and Citigroup Global Markets Inc ("Citigroup") and (iii) undisclosed conflicts for J.P. Morgan and Citibank.

6. The special meeting of Celgene's shareholders to vote on the Proposed Transaction is scheduled for April 12, 2019, at 10:00 (Eastern Time) (the "Shareholder Vote"). It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote so Celgene shareholders can properly exercise their corporate voting rights.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Celgene's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Celgene's common stock trades on the Nasdaq stock exchange, which is also headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

**PARTIES**

10. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Celgene common stock.

11. Defendant Celgene is a public company incorporated under the laws of Delaware with principal executive offices located at 86 Morris Avenue, Summit, New Jersey 07901. Celgene's

common stock is traded on the Nasdaq under the ticker symbol "CELG."

12. Defendant Mark J. Alles is, and has been at all relevant times, a director of the Company. Defendant Alles also serves as the CEO and Chairman of the board of directors.

13. Defendant Richard W. Barker is, and has been at all relevant times, a director of the Company.

14. Defendant Hans Bishop is, and has been at all relevant times, a director of the Company.

15. Defendant Michael W. Bonney is, and has been at all relevant times, a director of the Company.

16. Defendant Michael D. Casey is, and has been at all relevant times, a director of the Company.

17. Defendant Carrie S. Cox is, and has been at all relevant times, a director of the Company.

18. Defendant Michael A. Friedman is, and has been at all relevant times, a director of the Company.

19. Defendant Julia A. Haller is, and has been at all relevant times, a director of the Company.

20. Defendant Patricia Hemingway hall is, and has been at all relevant times, a director of the Company.

21. Defendant James J. Loughlin is, and has been at all relevant times, a director of the Company.

22. Defendant Ernest Mario is, and has been at all relevant times, a director of the Company.

23. Defendant John H. Weiland is, and has been at all relevant times, a director of the

Company.

24. The defendants identified in paragraphs 12 through 23 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Celgene, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

25. Celgene is a global biopharmaceutical company focused on the discovery, development and commercialization of products for the treatment of cancer and other severe, immune, inflammatory conditions.

26. On January 2, 2019, the Board caused the Company to enter into the Merger Agreement with Bristol-Myers.

27. Pursuant to the terms of the Merger Agreement, Bristol-Myers, upon the terms and subject to the conditions set forth in the Merger Agreement, will acquire Celgene in a cash and stock transaction valued at $74 billion.

28. According to the January 3, 2019 press release announcing the Proposed Transaction:

> **NEW YORK & SUMMIT, N.J., January 3, 2019** – Bristol-Myers Squibb Company (NYSE:BMY) and Celgene Corporation (NASDAQ:CELG) today announced that they have entered into a definitive merger agreement under which Bristol-Myers Squibb will acquire Celgene in a cash and stock transaction with an equity value of approximately $74 billion. Under the terms of the agreement, Celgene shareholders will receive 1.0 Bristol-Myers Squibb share and $50.00 in cash for each share of Celgene. Celgene shareholders will also receive one tradeable Contingent Value Right (CVR) for each share of Celgene, which will entitle the holder to receive a payment for the achievement of future regulatory milestones. The Boards of Directors of both companies have approved the combination.
>
> The transaction will create a leading focused specialty biopharma company well positioned to address the needs of patients with cancer, inflammatory and immunologic disease and cardiovascular disease through high-value innovative medicines and leading scientific capabilities. With complementary areas of focus, the combined company will operate with global reach and scale, maintaining the speed and agility that is core to each company's strategic approach.

Based on the closing price of Bristol-Myers Squibb stock of $52.43 on January 2, 2019, the cash and stock consideration to be received by Celgene shareholders at closing is valued at $102.43 per Celgene share and one CVR (as described below). When completed, Bristol-Myers Squibb shareholders are expected to own approximately 69 percent of the company, and Celgene shareholders are expected to own approximately 31 percent.

"Together with Celgene, we are creating an innovative biopharma leader, with leading franchises and a deep and broad pipeline that will drive sustainable growth and deliver new options for patients across a range of serious diseases," said Giovanni Caforio, M.D., Chairman and Chief Executive Officer of Bristol- Myers Squibb. "As a combined entity, we will enhance our leadership positions across our portfolio, including in cancer and immunology and inflammation. We will also benefit from an expanded early-and late-stage pipeline that includes six expected near-term product launches. Together, our pipeline holds significant promise for patients, allowing us to accelerate new options through a broader range of cutting-edge technologies and discovery platforms."

Dr. Caforio continued, "We are impressed by what Celgene has accomplished for patients, and we look forward to welcoming Celgene employees to Bristol-Myers Squibb. Our new company will continue the strong patient focus that is core to both companies' missions, creating a shared organization with a goal of discovering, developing and delivering innovative medicines for patients with serious diseases. We are confident we will drive value for shareholders and create opportunities for employees."

"For more than 30 years, Celgene's commitment to leading innovation has allowed us to deliver life-changing treatments to patients in areas of high unmet need. Combining with Bristol-Myers Squibb, we are delivering immediate and substantial value to Celgene shareholders and providing them meaningful participation in the long-term growth opportunities created by the combined company," said Mark Alles, Chairman and Chief Executive Officer of Celgene. "Our employees should be incredibly proud of what we have accomplished together and excited for the opportunities ahead of us as we join with Bristol-Myers Squibb, where we can further advance our mission for patients. We look forward to working with the Bristol-Myers Squibb team as we bring our two companies together."

**Compelling Strategic Benefits**
☐ **Leading franchises with complementary product portfolios provide enhanced scale and balance.** The combination creates:
- o   Leading oncology franchises in both solid tumors and hematologic malignancies led by Opdivo and Yervoy as well as Revlimid and Pomalyst;
- o   A top five immunology and inflammation franchise led by Orencia and Otezla; and
- o   The #1 cardiovascular franchise led by Eliquis.

The combined company will have nine products with more than $1 billion in annual sales and significant potential for growth in the core disease areas of oncology, immunology and inflammation and cardiovascular disease.

☐ **Near-term launch opportunities representing greater than $15 billion in revenue potential.** The combined company will have six expected near-term product launches:

- o   Two in immunology and inflammation, TYK2 and ozanimod; and
- o   Four in hematology, luspatercept, liso-cel (JCAR017), bb2121 and fedratinib.

These launches leverage the combined commercial capabilities of the two companies and will broaden and enhance Bristol-Myers Squibb's market position with innovative and differentiated products. This is in addition to a significant number of lifecycle management registrational readouts expected in Immuno-Oncology (IO).

☐ **Early-stage pipeline builds sustainable platform for growth.** The combined company will have a deep and diverse early-stage pipeline across solid tumors and hematologic malignancies, immunology and inflammation, cardiovascular disease and fibrotic disease leveraging combined strengths in innovation. The early-stage pipeline includes 50 high potential assets, many with important data readouts in the near-term. With a significantly enhanced early-stage pipeline, Bristol-Myers Squibb will be well positioned for long-term growth and significant value creation.

☐ **Powerful combined discovery capabilities with world-class expertise in a broad range of modalities.** Together, the Company will have expanded innovation capabilities in small molecule design, biologics/synthetic biologics, protein homeostasis, antibody engineering and cell therapy. Furthermore, strong external partnerships provide access to additional modalities.

**Compelling Financial Benefits**
☐ **Strong returns and significant immediate EPS accretion.** The transaction's internal rate of return is expected to be well in excess of Celgene's and Bristol-Myers Squibb's cost of capital. The combination is expected to be more than 40 percent accretive to Bristol-Myers Squibb's EPS on a standalone basis in the first full year following close of the transaction.

☐ **Strong balance sheet and cash flow generation to enable significant investment in innovation.** With more than $45 billion of expected free cash flow generation over the first three full years post-closing, the Company is committed to maintaining strong investment grade credit ratings while continuing its dividend policy for the benefit of Bristol-Myers Squibb and Celgene shareholders. Bristol-Myers Squibb will also have significant financial flexibility to realize the full potential of the enhanced late- and early-stage pipeline.

☐ **Meaningful cost synergies.** Bristol-Myers Squibb expects to realize run-rate cost synergies of approximately $2.5 billion by 2022. Bristol-Myers Squibb is

confident it will achieve efficiencies across the organization while maintaining a strong, core commitment to innovation and delivering the value of the portfolio.

**Terms and Financing**
Based on the closing price of Bristol-Myers Squibb stock on January 2, 2019, the cash and stock consideration to be received by Celgene shareholders is valued at $102.43 per share. The cash and stock consideration represents an approximately 51 percent premium to Celgene shareholders based on the 30-day volume weighted average closing stock price of Celgene prior to signing and an approximately 54 percent premium to Celgene shareholders based on the closing stock price of Celgene on January 2, 2019. Each share also will receive one tradeable CVR, which will entitle its holder to receive a one-time potential payment of $9.00 in cash upon FDA approval of all three of ozanimod (by December 31, 2020), liso-cel (JCAR017) (by December 31, 2020) and bb2121 (by March 31, 2021), in each case for a specified indication.

The transaction is not subject to a financing condition. The cash portion will be funded through a combination of cash on hand and debt financing. Bristol-Myers Squibb has obtained fully committed debt financing from Morgan Stanley Senior Funding, Inc. and MUFG Bank, Ltd. Following the close of the transaction, Bristol-Myers Squibb expects that substantially all of the debt of the combined company will be pari passu.

**Accelerated Share Repurchase Program**
Bristol-Myers Squibb expects to execute an accelerated share repurchase program of up to approximately $5 billion, subject to the closing of the transaction, market conditions and Board approval.

**Corporate Governance**
Following the close of the transaction, Dr. Caforio will continue to serve as Chairman of the Board and Chief Executive Officer of the company. Two members from Celgene's Board will be added to the Board of Directors of Bristol-Myers Squibb. The combined company will continue to have a strong presence throughout New Jersey.

**Approvals and Timing to Close**
The transaction is subject to approval by Bristol-Myers Squibb and Celgene shareholders and the satisfaction of customary closing conditions and regulatory approvals. Bristol-Myers Squibb and Celgene expect to complete the transaction in the third quarter of 2019.

**The Proxy Omits Material Information**

29.    On February 1, 2019, Defendants filed a materially incomplete and misleading Proxy with the SEC. The special meeting of Celgene stockholders to vote on the Proposed Transaction is on April 12, 2019. The Individual Defendants were obligated to carefully review the

8

Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

30. First, the Proxy fails to disclose that J.P. Morgan and Citigroup who rendered a fairness opinion for Celgene also holds 19,940,606 and 2,109,336 shares in Bristol-Myers since 2018, respectively. This is material because J.P. Morgan and Citigroup's ownership of Bristol-Myers stock rendered them conflicted since J.P. Morgan and Citigroup are economically motivated to ensure Celgene is sold to Bristol-Myers at a below market price because that will increase the value of its Bristol-Meyers stock. The Proxy also fails to disclose whether the Board even knew about and/or considered this conflict of interest.

31. The Proxy further fails to provide enough information regarding the financial projections for the Company. In particular, the Proxy fails to disclose the line items and components underlying Celgene's projected unlevered free cash flows. *See* Proxy at 152.

32. Investors are concerned, perhaps above all else, with the projections and cash flows of the companies in which they invest. Under sound corporate finance theory, the market value of a company should be premised on the expected unlevered free cash flows of the corporation (the "Cash Flow Projections"). Accordingly, the question that the Company's shareholders need to answer in determining whether to vote in favor of the Proposed Transaction is clear: Is the Merger Consideration fair compensation given Celgene's projected cash flows? Without the line items and components underlying Celgene's Cash Flow Projections for the years 2018 to 2028, the Company's shareholders will not be able to answer this critical question and assess the fairness of the Merger Consideration.

33. If a Proxy discloses financial projections and valuation information, such

projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. Regarding future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections relied upon by J.P. Morgan and Citigroup, but have omitted the line items and components underlying the Cash Flow Projections. Thus, Defendants' omission renders the projections disclosed on pages 151-52 misleading.

34. Citigroup's *Implied Premia Paid Analysis* also renders the Proxy materially misleading. Specifically, the Proxy fails to disclose the selected acquisition transactions utilized by Citigroup to establish a range of one-day unaffected stock premia of 32% to 56%. As a result, Celgene's stockholders are unable to determine whether Citigroup's illustrative range of prices per share of Celgene are reasonable and reliable. *See* Proxy at 128.

35. The discussion of Citigroup's review of *Equity Research Analyst Price Targets* is also materially misleading in that it fails to identify the analysts by name and to specify the price targets for the undisclosed analysts. *See* Proxy at 128.

36. With respect to Citigroup's *Discounted Cash Flow Analysis*, the Proxy is also materially misleading and incomplete because it omits the inputs and assumptions underlying the selection of the range of discount rates from 8.3% to 9.5% (*i.e.*, the components of Celgene's weighted average cost of capital) and the inputs and assumptions underlying the selection of the 1.50% to 3.00% terminal growth rates. *See* Proxy at 127.

37. J.P. Morgan's *Discounted Cash Flow Analysis* is similarly misleading and incomplete. While J.P. Morgan notes that the discount rate range of 8.50% to 9.50% was selected by taking into account target capital structures, yields for U.S. Treasury notes, levered and unlevered betas for Celgene, market risk premium, tax rates and "other appropriate factors," the Proxy fails to

identify the actual inputs underlying the discount rate range.  *See* Proxy at 118.

38. Defendants' failure to provide the foregoing material information renders the statements in the Proxy false and/or materially misleading.

39. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

40. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

41. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

42. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements

therein not false or misleading." 17 C.F.R. § 240.14a-9.

43. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

44. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, among other things: (i) certain line items and components underlying the financial projections for Celgene; and (ii) the valuation analyses performed by J.P. Morgan and Citigroup in support of their fairness opinions.

45. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

46. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that J.P. Morgan and Citigroup reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by J.P. Morgan and Citigroup, as well as the fairness opinions and the assumptions made and matters considered in connection therewith. Further, the Individual

Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review J.P. Morgan's and Citigroup's analyses in connection with their receipt of the fairness opinions, question J.P. Morgan and Citigroup as to the derivations of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

47. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

48. Celgene is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

49. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

50. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51. The Individual Defendants acted as controlling persons of Celgene within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Celgene, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

52. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

53. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

54. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants

reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

55. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

56. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

57. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 11, 2019						**MONTEVERDE & ASSOCIATES PC**

By: */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*